CRISTINA RIVERA NIEVES WIDOW OF RUIZ, Appellant, *v.* THE REGISTRAR OF PROPERTY OF PONCE, Respondent.

No. G-65-19.    Decided January 31, 1967.

---

894

*Armando Irizarry Hernández* for appellant. The registrar appeared by brief.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

On September 17, 1964, Cecilio Ruiz Vega, in his behalf and on that of nine of his brothers and sisters, among them Víctor Luis Ruiz Miranda, an emancipated minor, sold to Cristina Rivera Nieves, by public deed, half of an urban lot located in Ponce.

The deed of sale, together with the required complementary documents, was presented to the registry for its registration. The title was recorded,

". . . with the defect that it was not proved that in the execution of the deed of Emancipation the necessary formalities as to form and solemnities prescribed by the State of New York have been complied with according to that decided in the case of *Rojas, Randall & Co.* v. *Registrar*, 27 P.R.R. 20."

The purchaser-appellant correctly sustains that her title does not have such defect and that it was contrary to law to allege such defect.

In the documents presented to the registry the following circumstances are clearly stated:

(1) Víctor Luis Ruiz Miranda, the emancipated minor, was born in Ponce on September 28, 1943, and hence at the time the deed of his emancipation was executed—February 17, 1962—he was 18 years and four months old; (2) his father, Ramón Ruiz Hernández, was deceased, and Víctor's mother, Petra Miranda, had the patria potestas over him; (3) the emancipation was verified by a document executed in the city of New York, on the date indicated and signed by Mrs. Miranda, Víctor Luis, the minor—who consented to it—and Luz Mercedes O'Faurie and José O. Lugo, as witnesses. It appears authenticated by Notary Ramón Ortiz Díaz. The office of Notary he occupies is certified by James McGurrin, Secretary to the County and to the Supreme Court of the County of New York; (4) the docu-

ment of emancipation was protocolized in Ponce on February 23, 1962, by public deed, pursuant to the provisions of § 17 of the Notarial Law in effect. In the main part of its text the document of emancipation reads thus:

"EMANCIPATION.—State of New York, City of New York, United States of North America, on this 17th day of February, 1962, BEFORE ME THERE APPEAR:—AS PARTY OF THE FIRST PART: PETRA MIRANDA, of legal age, single, housewife, and resident of the City of New York, State of New York, United States of North America; and AS PARTY OF THE SECOND PART: VÍCTOR LUIS MIRANDA, eighteen years of age, single, student of the same city.—The appearing parties state that their names and personal circumstances are as aforesaid, and by virtue thereof they freely and voluntarily STATE:—FIRST:—EMANCIPATION: That VÍCTOR LUIS RUIZ MIRANDA was born on September 28, 1943, in Ponce, Puerto Rico, legitimate son of the late RAMÓN RUIZ HERNÁNDEZ and PETRA MIRANDA, appearing party herein, the said minor being under the patria potestas of his mother, whose birth was recorded on December 13, 1943, according to certificate No. 3413 of book No. 140 of the Registry of Vital Statistics No. 56 of Ponce, Puerto Rico, and the appearing party PETRA MIRANDA considering that her aforesaid son has the necessary legal capacity to govern his person and administer his property as if he were of full age, proceeds to emancipate him and through this document EMANCIPATES him so that he may govern his person and administer his property as if he were of full age, pursuant to sections two hundred thirty-three et seq. of the Civil Code of Puerto Rico, nineteen thirty edition, wishing and consenting to the making of the corresponding entry of this emancipation in the Birth Certificate of the aforesaid minor. SECOND—The minor, VÍCTOR LUIS RUIZ MIRANDA accepts this emancipation and grants his formal consent thereto. The appearing parties accept this document as it is drafted, and in witness whereof they sign it in the place and date set forth hereinbefore, in the presence of the undersigned witnesses.— (Sgd.) Luz Mercedes O'Faurie.—WITNESS.—Petra Miranda.—PETRA MIRANDA.—José O. Lugo—Witness.—Víctor Luis Ruiz Miranda.— VÍCTOR LUIS RUIZ MIRANDA."

The respondent registrar admits in his brief: "the capacity of the grantors of the emancipation document according to our law, causing the registration of the sale transaction; that the document of emancipation was executed in New York before a notary of that city; that the concept of public instrument is equivalent to a document executed before a notary and that . . . the forms and solemnities of public instruments are governed by the laws of the country in which they are executed, pursuant to § 11 of the Civil Code. . . ." He makes clear that the defect pointed out is not meant to challenge the legal capacity of the executing parties in the emancipatory act. He based the defect on the failure to prove that in the execution of the document of emancipation the necessary formalities as to form and solemnities prescribed by the laws of the State of New York have been complied with.

■ As counsel for petitioner correctly affirms, the juridical institute of emancipation has never been statutorily regulated in the State of New York. It does not have positive legislation regulating its substantive or formalist aspects, internal or external. There, as in other states, it is governed by the principles of Anglo-American common law which, in many senses, in this matter, are in disagreement with those which regulate it in jurisdictions of civil law.[1]

---

[1] The emancipation in the former may be express or implied consent of the parents or by operation of law; while in the latter the express consent of both the parent and the child is generally required; in the former, there are no limits for emancipation with respect to age, there having been cases in which the courts have considered emancipated a four-year-old minor— *Murphy* v. *Murphy*, 133 N.Y.S.2d 796, 798 (1954)—while in the latter, minimum ages are fixed for the minor to be emancipated, depending on the moment in which he has been considered to possess the necessary physical and intellectual capacity to be able to manage himself as if he were of legal age; in the former, the emancipation is a mere license granted by the parent, revocable at the father's will; in the latter, once the emancipation is granted it cannot be revoked, the patria potestas is extinguished forever and can never be reestablished. In certain cases it can be imposed against

In the State of New York the parent may emancipate his child by any kind of writing, public or private, or orally, in express or implied terms, and even without any express, written or oral formality, if the conduct of the parent towards his child reveals his firm intention of terminating every kind of family relationship, leaving it for the courts to decide whether with such conduct an emancipation has been produced.[2]

For the foregoing reasons we conclude that the emancipation of minor Víctor Luis Ruiz Miranda was executed pursuant to the juridical formalities and solemnities regarding that kind of acts then prevalent in the State of New York.[3]

On the other hand, the emancipation complies with the essential and formal requisites prescribed by our Civil Code for its validity.[4] The notarial practice in Puerto Rico, adjusting itself to the old civil legislation—§ 316 of the Spanish Civil Code—has always perfected the emancipatory act by public deed, even though since 1902 our positive legislation prescinded of the solemnity of the notarial public deed as the only and sacramental manner to perform the emancipation, providing in its second paragraph of § 303 of that year's Civil Code—now § 233 of its present edition—that:

the parents' will. Section 235 of the Civil Code. Unlike the Anglo-American common law, the Civil Law does not admit condition, term, or method in the emancipation, nor may its effects be patterned to the emancipator's or emancipated person's will, partial emancipation not being possible.

[2] *Crosby* v. *Crosby*, 246 N.Y.Supp. 384; *Boehm* v. *C. M. Gridley & Sons*, 63 N.Y.S.2d 587; *Cohen* v. *Delaware L. & W. R. Co.*, 269 N.Y.Supp. 667; *Hardy* v. *Eagle*, 54 N.Y.Supp. 1045; *Canovar* v. *Cooper*, 3 Barb. 115; *Giovagnioli* v. *Ft. Orange Const. Co.*, 133 N.Y.Supp. 92; *Murphy* v. *Murphy*, 133 N.Y.S.2d 796, 798 (1954); *Henderson* v. *Henderson*, 169 N.Y.S.2d 106.

[3] Pursuant to § 6 of the Executive Law of New York—Executive Law § 135, The Consolidated Laws of New York, Annotated, Book 18 at p. 63—every notary public duly qualified is hereby authorized and empowered within and throughout the state, among other things, to authenticate every kind of instruments in writing.

[4] See §§ 232 and 233 of our Civil Code.

"This emancipation takes. place by a declaration of the father or mother, before a notary public and in the presence of two witnesses, and with the consent of the minor."

■ In view of the clearness of this provision and notwithstanding Professor Muñoz Morales' preference for the classic formality of the public notarial deed—see his work *Reseña Histórica y Anotaciones al Código Civil* 667–68, part I —since 1902 it has been possible to perform the emancipation by means of a private statement authenticated before a notary, granted by the parent and child in the presence of two witnesses. Of course, its execution may be performed by public deed as it has been and continues to be done here, generally without the presence of witnesses, as we decided in *Toro* v. *Registrar*, 87 P.R.R. 846 (1963), where, among other things, we said:

"Section 233 *supra* of the Civil Code was patterned, in the part requiring the presence of witnesses, not on the Spanish Civil Code, but on § 366 of the Louisiana Code. In Spain, § 316 requires that the emancipation by concession of the father or mother be effected by the execution of a *public instrument* or by the appearance before a municipal judge. The local precept does not refer specifically to a public instrument; it requires that the act be executed by a 'declaration of the father or mother, before a notary public.' It is not necessary, therefore, that it be made in a public instrument, and conceivably it could be made by a sworn statement or affidavit, pursuant to the Act of March 12, 1903, 4 L.P.R.A. § 881 *et seq.* It is possible that the lawmaker required thereby the presence of witnesses. As indicated, in Louisiana it is provided that 'This emancipation takes place by the declaration to that effect of the father or mother, before a notary public in the presence of two witnesses.' West, Louisiana Statutes Annotated (1952), 2 Civil Code 537."

■ The document of emancipation executed in the State of New York having complied with the formalities and solemnities required for the validity of such act in Puerto Rico, it was unnecessary in any manner "to show that in the granting of the emancipation deed the necessary formalities pre-

scribed by the laws of the State of New York have been complied with," as alleged by the respondent registrar, who sustains the imperative character of § 11 of our Civil Code.

It is true that back in the year 1919, in relation to a sales contract for a real property located in Puerto Rico, which was executed in the City of New York between two corporations of that state, pursuant to § 11 of our Civil Code, we said in *Rojas, Randall & Co.* v. *Registrar*, 27 P.R.R. 20 (1919), that for its registration it was necessary to show that the necessary formalities as to form and solemnities prescribed by the laws of the State of New York had been complied with and that failure to prove it constituted a curable defect and not an incurable one as respondent registrar therein adduced.

■ Pursuant to the traditional standards of the occidental juridical regulations referring to the applicable law regarding the forms necessary to perfect the execution of a contract, will, or any other public document in a foreign country, our Civil Code has comprised in its § 11 the doctrine of the Private International Law known as *locus regit actum* and also as *lex loci actus*, which establishes the principle that in the execution of an act or contract in a foreign jurisdiction the parties must comply with all the formalities and solemnities prescribed by the laws of that country.

Already, in *Armstrong* v. *Armstrong*, 85 P.R.R. 387 (1962), we referred to those grounds and considerations which sustain the doctrine. We pointed out that the foundation of the rule is more in reasons of a practical than of a doctrinal nature.

In principle, this doctrine recognizes the existence of a great variety or diversity of standards designed to regulate the question of the forms and solemnities necessary to perform a valid execution. It recognizes also that many legal systems have created special juridical institutions to deal

with that problem and that they are, or could be, completely unknown by other systems.

It would be very difficult for a person away from his country on certain occasions to comply with all the legal requirements of the law of his country, because the person before whom he is to execute an act or contract is completely unfamiliar with those requirements and, in others, because the juridical system where the execution is to take place lacks the adequate formal juridical mechanisms or is unable to provide the necessary means for the execution to conform to the requirements of the law of his country.[5]

The doctrine has not sought to substitute the local legal external requirements for those of the nation of the executing party, by prohibiting compliance with the first; all that has been sought is to avoid that obstacles similar to those hereinbefore pointed out should prevent a person from expressing his will in a legally valid form.

■ If ultimately it is in the country of the executing parties where the act or contract shall have its effects, it would logically follow that preference should be given to the legal requirements of that country and that faced with the impossibility of complying with them, the requirements established by the jurisdiction where the execution is to be held should be applied. I Manresa, *Comentarios al Código Civil Español* 179–80. It is for that reason that most of the commentators favor the idea of construing that doctrine in a *facultative, potestative* or *optional* manner and not in a *coactive* or *imperative* form. See II Goldschmidt, *Sistema y Filosofía del Derecho Internacional Privado* 208 (2d ed. 1954) ; II Miaja, *Derecho Internacional Privado* 194 (1955) ;

---

[5] It has been pointed out also that a rule to the contrary would have the effect of requiring compliance with the formal requisites of all nations or places where the contract is to be executed, and besides, that the doctrine prevents contracts executed and perfected in good faith from being annulled. Lorenzen, *The Validity of Wills, Deeds and Contracts as Regards Forms in the Conflict of Laws*, 20 Yale L.J. 427.

Verplaetse, *Derecho Internacional Privado* 473 (1954); Nussbaum, *Principios de Derecho Internacional Privado* 169 (1947); II Romero del Prado, *Manual de Derecho Internacional Privado* 302 (1944). To that respect Rabel states the following in Tome II of his work The Conflict of Laws at 518:

"We have, however, realized the necessity of developing the rule so as to take care of the really typical modern cases. *Whenever the laws of two or more territories are involved in the formation of a contract, to give exclusive preference to one of them is quite as wrong as to cumulate their requirements.* Rather, *compliance with one of the two local laws should suffice.* The problem is different from the inquiries for determining the place of contracting for the purpose of finding the governing law or the law deciding whether or not the contract has been formed. *The customary privilege for upholding formal validity is sound; hence it ought to be extended rather than curtailed."* (Italics ours.)

If, as we have already pointed out, they are practical, rather than philosophical considerations those which sustain the *locus regit actum* doctrine, it is not difficult to conceive that the optional or facultative nature thereof is more congruent with those considerations or foundations.

■ Once it is clearly established that the execution of an act or contract may be subjected to the requirements of any one country, the executing parties would be free to choose compliance with such forms and solemnities as best conforms to their wishes, wills, and purposes. That classification is in harmony, besides, with one of the fundamental bases of the Private International Law: to facilitate all international relations and transactions. Lorenzen, *op. cit.* at 456. Lorenzen, *Uniformity Between Latin America and the United States in the Rules of Private International Law Relating to Commercial Contracts,* 15 Tul. L. Rev. 165.

It is not difficult either to conceive that part of the practical utility of the rule would be lost or curtailed in classi-

fying it as imperative, for we would be forcing an executing party to comply, without any reason or ground, with the laws of the place of execution, when he could comply with those of his country. That is why several states, some by legislative fiat and others by its case law, have recognized and accepted the optional nature of the rule.[6]

Nothing was provided in § 11 of our Civil Code regarding the facultative or imperative nature of its provisions. Its predecessor, § 11 of the Spanish Civil Code, does not add anything either in that respect. The opinion of the commentators on that matter is divided. The majority believes that, although a reform is necessary to conform § 11 to the more modern requirements of that branch of the law, in view of the clear precepts of that legal provision there should not arise any doubt as to the imperative nature of the provision. See in that respect Yanguas Messía, *Derecho Internacional Privado* 289–90 (2d ed. 1958); Lasala Llanas, *Sistema Español de Derecho Civil Internacional e Interregional* 30 (1933); I-1 Castán Tobeñas, *Derecho Civil Español, Común y Foral* 501. On the other hand, both Goldschmidt, *op. cit.* at 208, as well as Manresa, *op. cit.* at 179–80, believe that said provision is of an *optional nature*. To that effect the latter points out the following:

"As we have already indicated above, whenever possible, the citizen should abide by the law of his country, and this is permitted from the moment it is provided that in case juridical

---

[6] See § 26 of the Italian Civil Code of 1942, § 11 of the Greek Civil Code of 1940, § 5 of the Polish Act of 1926; § 11(2) of the Introductory German Act of 1896, still in effect; § 20 of the Egyptian Civil Code, § 7 of the Czechoslovakian Act. The French jurisprudence has recognized since 1909 the facultative nature of the doctrine. The Dutch jurisprudence has also pronounced itself in the same sense. See Verplaetse, *op. cit.* at 474. The Uniform Act on the execution of wills has accepted the optional form in its § 7; see 9A Uniform Laws Annotated 347 (1957). The State of New York has already incorporated to its legal system a similar legislation, 13 McKinney's Laws of New York Annotated, § 22(a), *Armstrong* v. *Armstrong, supra*.

acts are executed in foreign countries, they should be authorized by the diplomatic and consular officials who shall comply with the formalities of our laws: *the provision is then optional in general."* (Italics ours.)

■ The optional nature of § 11 of our Civil Code is the most satisfactory to us. As we have already stated, its practical utility would be restricted by a contrary interpretation.

The imperative nature of § 11 of our Civil Code conforms best to the legal requirements of the times when it was drafted. Today, nevertheless, the necessities and requirements of the modern world call for another interpretation. The close relation between nations, the outcome of the developments accomplished in the field of transportation and in the means of communications has eliminated many obstacles.

The registration of the sale title free of the curable defect set forth will be ordered.

Mr. Justice Rigau and Mr. Justice Ramírez Bages dissented.

—O—

MR. JUSTICE RIGAU, with whom MR. JUSTICE RAMÍREZ BAGES concurs, dissenting.

San Juan, Puerto Rico, January 31, 1967

This dissenting opinion is written on the premise that the end does not justify the means. Said premise is not only moral but juridical as well. Proof of this is the existence, in all the laws of the world, of codes and rules of civil and criminal procedure.

As there is an exception to every rule and in order to exhaust every hypothetical possibility, we can reduce the foregoing premise to the following terms: The end does not always justify the means. I sustain that the case at bar falls under this premise.

This opinion is also written on the second premise that the Supreme Court of Puerto Rico, because of its high rank

within the official hierarchy of our society and because of its special nature as a ruling institution of our law, is bound to deal with it with utmost care. If it were possible—for reasons which I shall hereinafter state—said care must be greater when dealing with our civil law as it is conceived in the Code of said name.

My principal objection to the majority opinion is of a constitutional and methodological order. Simply stated it is not proper to do what the majority opinion does to reach its conclusion. As I will try to prove, such methodical error is so dangerous that because of its size the minimum good that the decision offers does not represent adequate compensation to the prejudice it inflicts to our juridical order. I also have objections of a juridico-technical nature to the majority's opinion, which I shall point out later.

The juridical problem presented by the case at bar is simple. So is the provision of our positive law involved therein. As this case revolves around § 11 of the Civil Code, 31 L.P.R.A. § 11, it is convenient to reread it at the outset. Although this case deals only with the first paragraph, since this section is short, and for the sake of clearness and precision, we copy it in full here. Section 11 of the Civil Code reads:

"The forms and solemnities of contracts, wills and other public instruments *are governed* by the laws of the country in which they are executed.

"When such acts are authorized by diplomatic or consular officials of the United States abroad, the formalities established for their execution by the laws of the United States shall be observed.

"Notwithstanding the provisions of this and the preceding section, prohibitory laws relating to persons, their acts or property, and those which relate to public order and to good morals shall not be held invalid by reason of laws, decisions, regulations or agreements in force in any foreign country." (Italics ours.)

As we shall refer later to what textwriters have written on the matter, it is convenient also to clarify that § 11 of the Spanish Civil Code is identical to ours except that as is to be expected, where ours reads "diplomatic or consular officials of the United States" the Spanish Code refers to the diplomatic or consular officials of Spain and where ours talks about the laws of the United States the Spanish Code refers to the Spanish laws.

This case deals, in essence, with an 18-year-old minor who was emancipated in New York. The emancipation was executed (1) by written document, (2) by his mother with patria potestas (his father was deceased), (3) with the express consent of the minor, (4) before two witnesses and (5) the document was duly authenticated before a notary.

The emancipated minor and some of his brothers and sisters sold some real property located in Puerto Rico. The Registrar recorded the title but entered a curable defect that it was not shown in the execution of the emancipation deed that the requirements as to form and solemnities prescribed by the State of New York, where the emancipation document was executed, had been complied with.

The Registrar is correct. The defect is curable and the proper thing to do is to cure it. We have so decided before. *Rojas, Randall & Co.* v. *Registrar*, 27 P.R.R. 20 (1919). There we said at page 22:

"We agree with the registrar that neither does the document show that the necessary formalities as to form and solemnities prescribed by the laws of the State of New York for the conveyance of real property have been complied with. The interested party must prove this and his failure to do so constitutes a curable defect which does not prevent the recording of the instrument."

Yet, what does the majority opinion decide? The majority opinion, in spite of the clear and conclusive provision of § 11 of the Civil Code, in the sense that "The forms and

solemnities of contracts, wills, and other public instruments are governed by the laws of the country in which they are executed," states—the opinion—that that provision of the Code is of an optional nature, that is, discretionary; that it is not mandatory. The opinion of the majority decides that as the emancipation executed in New York complies with the *formal* requirements prescribed for emancipations executed in Puerto Rico, therefore it is subject to registration without any curable defect.

As I said before, I have two main objections to the opinion of the majority. One is juridico-technical in nature. That is, as a question of law, the majority opinion is, from my viewpoint, erroneous. I will try to prove it with the same authorities cited by the majority, besides adding others. The other objection, I said, is of a constitutional and methodological nature. In discussing the latter I will try to prove why it is not justifiable or advisable to do violence to our system of civil law as said opinion has done, but that, on the contrary, it is prejudicial to our law. Let us turn first to the objection of law I raise to the opinion of the majority.

In this aspect the controversy revolves around the nature of § 11 of the Civil Code. The opinion of the majority maintains that said section is discretionary. I maintain it is mandatory. Many of these conflicts of interpretation could be avoided if at the outset the law itself was read. That is why we have copied said section at the beginning of this opinion. Notice that § 11 does not say that the instruments *may* be governed by the laws of the country where they are executed but says that they *are governed* by the laws of the country where they are executed. The Code could not have stated it in more clear and positive terms. What the opinion of the majority proposes is not a new interpretation but a new drafting of the section. But the latter is part of the argument we have reserved for the second term. We are now considering the nature of § 11.

The opinion of the majority cites some commentators on civil law and on private international law. Let us see what those commentators say. The first seven I will mention are cited in the opinion of the majority. Let us begin with the internationally known scholar on private international law, Ernst Rabel. Said author maintains the position I hereby sustain, that is, that § 11 is mandatory. In fact, he says that it is imperative *in Puerto Rico* and Spain. Let us read his own words:

"[*L*]*ocus regit actum acquired compulsory force.* Whatever law may govern the contract in other respects, *the law of the place* where it is made *always determines* whether any formalities are obligatory, and if so, which are required. *In this shape as imperative,* the rule was recognized for a long time in England, and appears in a number of countries." (Italics ours.)

At the end of that quotation the author places his footnote 5 where he mentions the countries in which the provision herein discussed is imperative. In that footnote he specifically mentions Puerto Rico, Spain, and more than ten other countries of civil law.[1]

The second author cited whom we shall examine is another commentator of the private international law, Julián E. Verplaetse. This author also concludes that the provision of § 11 is imperative. In the section of his treatise devoted to the conflict of acts in the Spanish law, precisely when discussing the nature of the provision in question, he states the following:

"As we have already said there seems to be no disagreement in that respect between the two authors: the positive Spanish system shall be interpreted as imperative." *Derecho Internacional Privado* 487 (1954).

Another author cited in the opinion of the majority is Arthur Nussbaum, Principles of Private International Law

---

[1] Rabel, The Conflict of Laws 488 (1960 ed.). Page 486 of the 1947 ed.

(1943). Writing about the law applicable to the form of the juridical acts in his aforementioned work, the author says at pp. 148–149:

"In common law as well as in civil law it is a familiar process to sever the 'form' from the 'substance' of a transaction and, on the basis of this differentiation, to contrast its 'extrinsic' and the 'intrinsic' validity. Throughout the law of conflicts this issue makes itself felt: in wills, in contracts, in deeds, and in marriages. The question is whether the formalities of a transaction may be governed by a law other than that controlling the substance. *Civil law has long, and in a sweeping way, given an affirmative answer*. As early as Bartolo the view was taken that the formalities of a transaction and the effects of their non-observance are governed by the law of *the place* where the transaction was executed (*lex loci actus*) ; and this broad proposition, which was later styled *locus regit actum*, has become well settled and a characteristic feature of continental Private International Law. It has been incorporated in many codes, particularly in the German, Italian, Brazilian, and Japanese.

"Common law has no similar broad rule, but is distinctly moving towards it so the gap between the two great systems has considerably narrowed on this score. Contracts and marriages which are valid under the *lex loci actus* are recognized as valid in England and the United States." (Italics ours).

Another work cited is 2 Romero del Prado, *Manual de Derecho Internacional Privado* (1944). Regarding the *imperative* or *optional* nature of the rule *"locus regit actum,"* which is the one contained in § 11 of the Civil Code of Puerto Rico, in the Spanish Civil Code and in almost all civil codes, he states his criterion that for the forms "adprobationem" said rule should be applied but not for the forms "ad-solemnitatem", *unless otherwise provided by law*. Said author recognizes, then, as it is natural for him to do, that the rule must be imperative or not as provided by law. We already know what the law provides in Puerto Rico, so it cannot be said that Romero states that our § 11 is of an optional nature. On the contrary, the logical conclusion

of his explanation is that in Puerto Rico the rule is impera-
tive because it is so provided by law. The discussion men-
tioned appears on pages 302–303 of his cited work.

Another author cited is 2 Adolfo Miaja, *Derecho Inter-
nacional Privado* (1955). After pointing out that "the most
generalized doctrine is that of imperativeness," and after
citing in that sense commentators Lasala Llanas, Trías De
Bes, Yanguas and Verplaetse, Miaja concludes: "We believe
this opinion is the best adjusted *to our positive law. . . ."*
Pp. 194–195 of his cited work.

In 2 *Sistema y Filosofía del Derecho Internacional Pri-
vado* (1954), Goldschmidt discusses the concepts of form
and contents of the instruments. He prefers the optional form
of the *locus regit actum* rule but recognizes that the first
paragraph of § 11 "establishes that the forms and solemni-
ties of the contracts, wills, and other public instruments *are
governed by the laws of the country in which they are exe-
cuted.*" (Italics ours.) *Op. cit.* at 201. He points out that
§ 11 contains an exception in stating in its second paragraph
that when such acts are authorized by diplomatic or consular
officials of Spain abroad, the formalities established for their
execution by the laws of Spain shall be observed. As we have
seen, our Code contains a similar exception.

When Manresa says that the provision of § 11 is optional
he is not using the concept in the same manner the opinion
of the majority understands it. What Manresa points out
is that § 11 *allows* a Spanish citizen who executes an instru-
ment abroad to comply with the laws of his country if he
executes it before diplomatic or consular officials of Spain.
That is, Manresa does not sustain that the application of
the section is discretionary. He maintains that § 11, by
virtue of its second paragraph *allows an exception* to the
general rule established in its first paragraph. In other
words, what he points out is that it is optional for the

Spanish citizen who executes an instrument abroad to observe the formalities of the country where he executes the document (first paragraph of § 11) or to observe the formalities required by the Spanish law if he goes before a diplomatic or consular Spanish official. I Manresa, *Comentarios al Codigo Civil Español* 240 (1956). In the 1943 edition, at p. 180. As we have already pointed out, our own § 11 permits a similar option.

José Castán Tobeñas, Chief Justice of the Supreme Court of Spain, has written as follows:

"The Spanish legislation accepts without hesitation, regarding the extrinsic forms of the juridical acts, the old *locus regit actum* rule, taken from the statutory theory. Section 11, paragraph 1, prescribes that 'the forms and solemnities of contracts, wills and other public instruments are governed by the laws of the country in which they are executed'. Although the legal expression is incomplete, it should be understood that every kind of juridical act, no matter its form, whether public or private, or oral, are subject to the traditional *locus regit actum.*

"There is a case in which the formal statute is optional, because the Code says that when the acts 'are authorized by diplomatic or consular officials of Spain abroad, the formalities established for their execution by the laws of Spain shall be observed' (§ 11, second paragraph)." I-1 *Derecho Civil Español, Común y Foral* 500–501 (10th ed., 1962). In the 9th ed. (1955) I-1 at 446–447.

Another Justice of The Supreme Court of Spain and also professor of civil law, Francisco Bonet Ramón, commenting § 11 writes:

"[I]t is equally understood that I consider natural compliance in the place of execution inasmuch as, in effect, before a Notary of that place hardly a different form could be observed.

"That is why we must understand that the *locus regit actum* refers, of course, to lawful acts. Within the group of juridical acts, it covers the unilateral acts (for example, wills, termination of a contract for services, etc.) as well as the multilateral . . . ."—*Código Civil Comentado* 58 (1962).

Like the other authors, Bonet Ramón in I *Compendio de Derecho Civil* 232 (1959) concludes that "Pursuant to the first paragraph of § 11 of the Civil Code, the forms and solemnities of contracts, wills, and other public instruments are governed by the laws of the country in which they are executed."

It may be seen that § 11 because (1) of its clear and express text, (2) its historical origin,[2] (3) as well as because of the quasi-universal criterion of the doctrine, is of an imperative nature. That is the common law rule. On the contrary, the Anglo-Saxon common law does not give preference to any rule although it can be said that, in general, as far as successions are concerned the *lex rei citae* governs. Nevertheless, the common law is getting closer to the civil law rule of *locus regit actum.* Rabel points out that the majority of the states of the American Union have already incorporated *legislatively* said norm to their law.[3]

The majority opinion, therefore, errs in believing that § 11 of the Civil Code in discretionary. Said section is imperative.

## II.

Let us now turn to the second objection I make to the majority opinion. This is of a constitutional and methodological order. The majority opinion, as I have pointed out, makes a direct amendment to the Civil Code. In doing so it, of course, violates § 14 of said Code which prescribes that when a law is clear the letter of the same shall not be disregarded under the pretext of fulfilling the spirit thereof. In this case we are not even trying to fulfill its spirit, that is, its intention. That first paragraph of § 11 is explicit and its intention arises clearly from its own letter. If the

---

[2] We can briefly trace thus the antecedents of § 11 of our Civil Code: § 11 of the Spanish Civil Code (1888); X *Novísima Recopilación*, Title 20, Act 18 (1805); III *Las Partidas*, Title 18, Law 111 (1256–65); the statutorians, especially Bartolo, XIIth Century.

[3] See Vand. L.R. 533–542. See also Lorenzen in 20 Yale L.J. 432.

clear and explicit letter of the section were not sufficient—
it should suffice—there is its history and the American and
foreign doctrines which we have outlined. But what I con-
sider more serious and objectionable in the majority opin-
ion—and this is my main objection—is that it is contrary
to our constitutional system and contrary and prejudicial to
our juridical system. It is contrary to our constitutional
system because it corresponds to the Legislature to make
the direct amendments to the written law in Puerto Rico.
It is contrary and prejudicial to our juridical system be-
cause this is a jurisdiction of civil law and written law and
the opinion of the majority introduces in our civil law the
crude form of amending without compunction, the Civil Code
by means of cases, a more appropriate form for less mature
laws.[4]

In our constitutional system, a democratic-representative
one, it is up to the political departments of the government
—the Legislative and the Executive—to legislate. This is
not the makings of caprice or whim but it is the necessary
consequence of the democratic system. To make the law is
to make public policy and it corresponds primarily to the
Legislative and the Executive powers to make it because
these are the two departments of the government which are
subject periodically to the endorsement or repudiation of the
people through the polls and are thereby directly responsible
to the people.[5] The supremacy of the written law is uni-
formly recognized in civil-law countries and even in tradi-

---

[4] Not only are the commentators of civil law of that opinion but very
eminent jurists of the Anglo-Saxon common law have concluded likewise.
V.g. Pound, "It [legislation] is the characteristic mood of lawmaking in
matured systems."—The Formative Era of American Law 71 (1938).

[5] How necessary it is for a judge to have a clear concept of the polit-
ico-democratic theory in order to draw the line between adjudication and
legislation! As Frankfurter points out in his already classical essay, the
only sure safeguard preventing the judge from crossing his judicial lines
is an alert recognition not to cross it and a trained reluctancy to do so.
See *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527
(1947). On the politico-democratic theory see Coker, Recent Political

914

tionally common-law countries when the legislative organ approves legislation, its preeminence is recognized because said legislation represents the most explicit framing of the public policy.[6]

The primary function of the judicial department is that of passing on cases and controversies and, naturally, in order to do this it must apply the law and construe it whenever necessary. Nevertheless, it is clear that judicial discretion is not absolute. Like everything else, judicial discretion has its limits. If the judicial bodies were relieved from their subordination to the law and they were allowed to make amendments to the latter under color of their advisability it would create the unfortunate situation of losing the certainty of the law and its objective and impersonal value which is in itself a precious guarantee of liberty. The so-called freedom of the judge to modify the law would be essentially resolved in the negation of true liberty, which is the liberty under the law democratically enacted, known by all and applied equally to all.[7]

---

Thought, Ch. X The Democratic Tradition and Ch. XIX Law and the State (1934); Locke, Second Treatises of Civil Government (1690); Lindsay, A.D., The Modern Democratic State (1943); Mill, John Stuart, Representative Government (1861); Bentham, A Fragment on Government (rev. ed. 1960); Finer, Theory and Practice of Modern Government (rev. ed. 1960); Friedrich, Constitutional Government and Democracy (rev. ed. 1950). See also Hand, L., Sources of Tolerance, 79 U. of Pa. L. Rev. 1, 12 (1930) reprinted in The Spirit of Liberty 66, 81 (Dillard ed., 1952).

[6] Many cases of the United States Supreme Court recognize this. For a recent opinion of said Court see Switzerland Assn. v. Horne's Market, 385 U.S. 23, 25 (35 U.S. L. Week 4001, 1966). In that case, upon sustaining a legislative piece the Supreme Court used these words: "We see no other way to protect the integrity of the congressional policy. . . ." It has very well been said: "In the day-to-day working of our democracy it is vital that the power of the non-democratic organ of our Government be exercised with rigorous self-restraint." 335 U.S. 555.

[7] See on this Castán, La Formulación Judicial del Derecho 116 (1954 ed.) and Del Vecchio I Filosofía del Derecho, translated by Recaséns 309 (1929).

It is clear that it is not convenient for the state of the law that the Civil Code should lose its certainty and become subject to the determination of a majority of a court, in every occasion, as to which language satisfies it most. If that fashion of applying the law were accepted, would any sentence be left in the whole Code worth the paper on which it is printed? If the majority of the Court can amend directly the first sentence of § 11, why could it not amend any other provision of the Code? If that were so the Code would no longer say what its own text prescribes. As it is known, the Civil Code deals with institutions extremely important to the lives of individuals and of society, such as marriage, divorce, successions, contracting, family relations, etc. It is convenient for the best public interests that that legislation may only be amended by the Legislature which is the organ responsible to the people.

As it must be known by now, I am not among those who believe that the law should be applied according to the postulates of the anachronic analytical school. I rather believe in the application of the law as understood by the jurists of the sociological school. As far as our Civil Code is concerned I have said before that we should interpret it with imagination in order to impart flexibility to and revitalize it so as to insure its permanence inasmuch as said legal body is one of our most finished and valuable legislative pieces. *Borges* v. *Registrar*, 91 P.R.R. 106 (1964).

However, right there, in *Borges*, we said that "We are not doing violence to the provisions of the Civil Code" because there we acted within its provisions. One thing is the judicial application and construction of the written law, which is necessary and permissible in the civil-law countries, and another is the free formulation of the law by the courts in common-law countries, when they lack express legislation regarding the matter under consideration. A cautious judge will always bear these differences in mind when applying

either the civil or the common law.[8] What the majority opinion proposes, as I pointed out before, is not a new interpretation but a new drafting of the law and it does violence to the written test and to the whole spirit embodied in the civil law.

A distinguished scholar of these problems has written:

"There is a great deal of difference between acceptance of a law of precedents largely in-lieu-of statutory law according to the common law pattern and its use in aid of statutory law according to the civil law model.

.    .    .    .    .    .    .    .

"Apart from the area of constitutional decision making, statutory law creation is rapidly taking over traditional spheres of the common law. The law creativeness of a judicial decision within a system of largely statutory law is, of course, quite different in scope from that of a decision operating within a system of common law. To the extent that statutes can be formulated without undue verbosity and ambiguity, they are preferable to common law dispositions."—Silving, work cited in footnote 8 at pp. 195, 241–242.

Some authors propose that the codes be amended so as to give § 11 more flexibility. I believe that such legislative reform of § 11 is desirable. In the United States the Model Execution of Wills Act sanctions the civil rule of *locus regit actum* and also recognizes the validity of the will executed in accordance with the law in force in the domicile of the testator at the moment of testating. The State of New York has adopted the rule of *locus regit actum legislatively* and a provision similar to the Model Act. For the corresponding authorities on these particulars see *Armstrong* v. *Armstrong*, 85 P.R.R. 387, 393–395 (1962), where we examined these questions carefully. If the Civil Code is to be amended in that respect it would suffice to procure a brief and non-

---

[8] Silving, Helen, *Stare Decisis in the Civil Law and in the Common Law*, 35 *Rev. Jur. U.P.R.* 195 (1966); Castán, *"En Torno al Derecho Civil de Puerto Rico,"* 26 *Rev. Jur. U.P.R.* 7 (1956).

controvertible legislative amendment to the first sentence of § 11. That can very well be undertaken and obtained by the Department of Justice. To prepare and undertake the task of reforming our written law is one of the functions of the Ministries of Justice. See Cardozo, A Ministry of Justice;[9] Castán, I-1 *Derecho Civil Español, Común y Foral* 194 (10th ed. 1962); Trías Monge, *Derecho y Justicia en Puerto Rico,* 25 *Rev. C. Abo. P.R.* 417 (1965); Pound, I Jurisprudence 356 (1959); III at p. 600.

That—the legislative amendment—is the correct manner of amending a Civil Code. The Bases Act of May 11, 1888, which authorized the drafting of the Spanish Civil Code by the Codes Commission, in its base 27 provided a system of periodical revisions of the Code and the Spanish Civil Code itself in its Additional Provisions prescribes that the Chief Justice of the Supreme Court and those of the Territorial Audiences shall send, at the end of each year, to the Minister of Pardon and Justice an informative Report of the deficiencies and doubts which the civil courts had encountered in applying the Code, and in the light of the data thus obtained, of the accomplishments attained in other countries which could be utilized, and of the case law of the Supreme Court, the Code Commission shall prepare and send to the Government the reforms which may be convenient to introduce.

Footnote 6 of the majority opinion itself implicitly sustains my position. It mentions how many countries have *legislatively* amended their codes and laws to reform the legislative provision herein discussed, namely, Italy, Greece, Poland, Germany, Egypt and Czechoslovakia. Even in New York, a common-law jurisdiction, said reform has been made through legislative amendment. However, here, in a civil-law jurisdiction, it is sought to amend the Code with an

---

[9] 35 Harv. L. Rev. 113.

opinion. As an exception, the reform herein discussed has been made in France by jurisprudential action because the French Code does not contain an express provision to that effect, as against the Puerto Rican Code and many others.[10]

What has been said so far herein should serve to remember that the Court should not function as an "organism of power exclusively." We constitute a court of law and that imposes on us an inescapable responsibility towards the juridical discipline. We have previously been reminded of this from outside.[11] We should remember it from within. Besides the technical, methodological and constitutional aspects I have mentioned, there is another consideration the Supreme Court of Puerto Rico should keep in mind. This is a juridical consideration in the most profound sense of the word. When the Great Discoverer planted his banner in this country he sowed here the seed of the civil law. This is a civil-law jurisdiction. Our Civil Code is one of our major juridical values. That alone should be sufficient for the Puerto Rican Courts and judiciary to safeguard it. It is even more necessary because we have here a society where the two great juridical occidental systems coexist, the civil law and the Anglo-Saxon[12]

---

[10] Romero, *op. cit.* at 294.

[11] Alonso, Rafael, *Comentario al Caso de Hernández* v. *Cuevas Viret y Asociación de Empleados*, decided June 27, 1963, 33 *Rev. Jur. U.P.R.* 451, 469 (1964).

[12] I say "Anglo Saxon Common Law" when I refer to the "common law" to distinguish it from the common law of Continental-European countries. The Spanish Civil Code itself recognizes the Spanish Common Law, §§ 15 and 1976. Castán's well-known treatise on Civil Law is entitled *Derecho Civil Español, Común y Foral.* A Scots author states the following:

"I decline to regard the expression 'common law' as the monopoly of Anglo-American lawyers. All European civilian systems have had their common law, and in the era before codification there was virtually a common law of Europe."—Smith, "The Preservation of the Civilian Tradition in Mixed Jurisdiction," in Civil Law in the Modern World, Yiannopoulos, Ed. (1965), p. 3, reprinted in 35 *Rev. Jur. U.P.R.* 263, 266 (1966). See also I-1 Castán, *op. cit.* at 129 (1962); I Sánchez Román, *Estudios de Derecho Civil* 67 (1899).

common law. The influx into our law from the common law is massive. This is so, in a great measure, because of the substantial economic power that is enjoyed at present by the countries where that law governs. Of course, that influx is very often convenient. Other times it is not. In the juridical field, whose responsibility is it, if not this Court's, to watch for those differences?

It is erroneous to apply indiscriminately casuistical techniques of the Anglo-Saxon common law to the elaboration of the civil law. There is no doubt that jurisprudence has its creative role in both law systems but it is necessary that differences be noted. The casuistical technique is useful in the civil law to fill in gaps and in applying and interpreting the positive rule but it should not be used as a substitute thereof. The Court errs in allowing the direct amendment to the provisions of the Code because possibly it could open the door, unawares, to a practice which with the passing of time could eventually lead to the destruction of our civil law.

Upon meditating on the juridical dealings in Puerto Rico, given the circumstance that the civil law and the Anglo-Saxon common law operate here, and upon considering that "perhaps the future has in store for the juridical culture of your people very transcendental missions . . . and that a happy synthesis may be accomplished" Castán warns us that "this ambitious aspiration shall require a long way which you should treat with great prudence and parsimony."[13] I believe that due prudence is absent in the manner used by the majority opinion to decide this case, from which I dissent.

A Puerto Rican scholar of our Law, also concerned about it which should be a major concern of this Court has written:

[13] *En Torno al Derecho Civil de Puerto Rico*, 26 *Rev. Jur. U.P.R.* 7, 17 (1956).

We have already concerned ourselves, although superficially, with our inescapable duty of elaborating "a synthesis" of the two juridical systems mentioned. *Barreras* v. *Santana*, 87 P.R.R. 215 (1963) and footnote 1 therein.

"The civil law in Puerto Rico is in danger of being devitalized. Vast zones of it . . . have been yielded without valid reason for it, to American jurisprudence. Concepts of common law also color and affect other institutions of our civil law, not because the postulates of our society so require but by sheer indolence or carelessness or undue appreciation of the values involved. The loss or corruption of a country's law entail consequences as grave as those produced by the dereliction or adulteration of its language. Irrespective of the position sustained regarding the political destiny of this country, it is the responsibility of our bar to safeguard the welfare and enrichment of our juridical institutions. The substitution or even the alteration of figures of the civil law for principles of the common law or of other laws is completely acceptable if as a result, the country's interests will be best served, but not if the displacement occurs by pure senseless action or uncautious development of the process of juridical assimilation."[14]

The foregoing considerations and the knowledge I must presume the members of the Court have of the conditions under which our law evolves should be more than sufficient to appreciate the necessity of preventing that the techniques of the Anglo-Saxon common law, very much part of said law should have the effect, with the lapse of time, of devitalizing and adultering our civil law to the point of making it unrecognizable. Handle this matter with the prudence recommended by José Castán Tobeñas.[15]

The existence and survival of the civil law in those countries where it coexists with the Anglo-Saxon common law has been and still is object of concern and consideration to jurists of different countries. Besides the four works already cited of Castán, Trías, Silving and Smith, see Baudouin, *"Le Code Civil Quebecois: Crise de Croissance ou Crise de Vieillese,"* 44 The Canadian Bar Rev. 391 (1966) ; Azard, *"Le Probleme Des Sources Du Droit Civil Dans La Province*

---

[14] Trías Monge, *Derecho y Justicia en Puerto Rico*, 25 *Rev. C. Abo. P.R.* 417, 418 (1965).

[15] Work cited in footnote 12.

*de Quebec,*" 44 The Canadian Bar Rev. 417 (1966); Hood, "*Louisiana and the Civil Law: A Crossroad in Louisiana History,*" 22 La. L. Rev. 709 (1962); Tate, "*Techniques of Judicial Interpretation in Louisiana,*" 22 La. L. Rev. 727 (1962): Ortiz, "*El Derecho Como Vehículo de Expresión de Nuestra Cultura,*" 5 *Rev. C. Abo. P.R.* 133 (1940); Rodríguez Ramos, "*Reexamen del Precedente Judicial en Puerto Rico,*" 15 *Rev. C. Abo. P.R.* 7 (1954); Muñoz Morales, *Reseña Histórica y Anotaciones al Código Civil de Puerto Rico,* 1947; Muñoz Morales, *Compendio de Legislación Puertorriqueña y sus Precedentes,* 1948; Rodríguez Ramós, "*Breve Historia de los Códigos Puertorriqueños,*" 19 *Rev. Jur. U.P.R.* 233 (1950); Friedmann, W.; "*Stare Decisis at Common Law and Under the Civil Code of Quebec,*" 31 The Canadian Bar Rev. 723 (1953).

Summarizing: As a question of law the majority opinion errs in concluding that § 11 of the Civil Code is merely optional, because it is imperative. This is sustained by its own clear and explicit letter, its history, and the Spanish and foreign doctrine.

As a matter of public policy, both in the constitutional and the juridical order, said majority opinion is objectionable because it is contrary to our constitutional system of legislating—which assigns this function primarily to the legislative body—and furthermore it injures our civil law system upon introducing the manner of amending the Code by means of cases, an appropriate method for other law systems but which is most unsuitable to ours.

I believe that to procure by means of an opinion a slight reform to § 11 of the Civil Code, the Court should not jeopardize two values of great importance in the Puerto Rican life: (1) our constitutional system of legislating and (2) our civil law and its own and inherent juridical methodology.